IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

SANDRA L. HEADY,           )
                                )
        Plaintiff,          )
                                )    No. 2:04-0092
      v.                   )    Judge Nixon
                                )    Magistrate Judge Griffin
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,[1]  )
                                )
        Defendant.     )

To: The Honorable John T. Nixon, Senior District Judge

**REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying the plaintiff's application for Social Security Income ("SSI") under the Social Security Act (the "Act"). The plaintiff seeks a reversal of the Commissioner's decision or, in the alternative, a remand.

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and this case should be remanded for further action in accordance with the recommendations contained herein.

## I. INTRODUCTION

The plaintiff filed the current application for Supplemental Security Income ("SSI") on October 3, 2000. (Tr. 105-07.) The plaintiff's application was denied initially on January 2, 2001. (Tr. 71-72.) The plaintiff filed a request for reconsideration, which was denied on May 24, 2001. (Tr. 73, 79.) The plaintiff filed a request for hearing before an Administrative Law Judge ("ALJ") on June 29, 2001. (Tr. 90.) A hearing was held January 10, 2003. (Tr. 44-70.) The ALJ issued an unfavorable decision on March 26, 2003. (Tr. 17-37.) The plaintiff requested review of the ALJ's unfavorable decision on April 29, 2003. (Tr. 15.) The Appeals Council issued an order on August 5, 2004, denying the request for review. (Tr. 6-8.)

## II. BACKGROUND

The plaintiff was born on January 23, 1960, and she was 40 years old on November 17, 1999, the date of the alleged onset of her disability. (Tr. 47, 21.) The plaintiff has more than a high school education. The plaintiff completed 13 years of school and a vocational course in Electronic Office Technology.[2] (Tr. 47.) The plaintiff's past work included work as a case manager, an assembler, and a waitress. (Tr. 65.) The plaintiff quit working in 1999 due to back pain, and she had not obtained a full-time job as of the date of her hearing. (Tr. 47, 50.)

---

[2]The plaintiff indicated that she got her G.E.D. at age 16 and started working after that before enrolling in one year of college at Tennessee Technological University. (Tr. 284.)

Case 2:04-cv-00092   Document 17   Filed 09/23/08   Page 2 of 45 PageID #: 7

**A. Chronological Background: Procedural Developments and Medical Records** [3]

Although the alleged date of onset in this case is fixed at November 17, 1999, it is appropriate to review some of the plaintiff's records prior to this date where, as here, the plaintiff has complained of a history of chronic conditions preceding the date of the alleged onset of disability.[4]

The plaintiff began seeing Dr. P.K. Jain, her treating physician and a doctor at the Cookeville Medical Center with a speciality in Family Practice and Internal Medicine, on February 26, 1998, complaining of a headache, blurred vision, and nausea. (Tr. 208.) The plaintiff related a history of high blood pressure, and Dr. Jain diagnosed her with hypertension. *Id.* Dr. Jain prescribed Lotensin and HCTZ (hydrochlorothiazide), medications prescribed to patients for treatment of high blood pressure. *Id.* The plaintiff returned to Dr. Jain for a subsequent visit on April 12, 1998, complaining of a headache, throbbing in her neck, nosebleed, dizziness while lying down, and "feeling very tired." (Tr. 206.)

The plaintiff next reported to Dr. Jain on January 1, 1999, complaining of chest pain. (Tr. 198). An electrocardiogram was ordered at the Cookeville Medical Center, and the plaintiff was put on Prevacid, a short-term treatment for irritation of the esophagus. (Tr. 197.) The plaintiff returned to Dr. Jain on February 18, 1999, for a follow up appointment regarding her chest pains.

---

[3] Every attempt to decipher the medical evidence of record was undertaken; however, various handwritten sections were simply illegible. General information on the drugs prescribed to the plaintiff was obtained from reputable online resources, unless otherwise indicated.

[4] The plaintiff repeatedly told several different doctors about her family history of medical problems. Her father and brother had asthma; her grandparents had cancer; both parents and grandparents had high blood pressure; her parents and her grandparents had heart disease; her mother and both of her grandmothers had diabetes; her father, one grandmother, and one grandfather had a history of strokes; and her son and daughter had tuberculosis. (Tr. 310.)

3

(Tr. 194.) The plaintiff stated that she was "doing better." *Id.* She was instructed to continue taking Prevacid, and to refill her HCTZ and Lotensin medications. *Id.*

In early December 1999, a little under a month after the alleged date of onset of plaintiff's disability, the plaintiff began seeking medical treatment for back pain. (Tr. 189.) Dr. Jain ordered an MRI, which revealed disc extrusion. (Tr. 190.) Dr. Jain referred the plaintiff to Dr. Jestus, a neurosurgeon, in February 2000 for evaluation of her low back pain and left sciatica. (Tr.188, 174.)

Dr. Jestus assessed the plaintiff as a 40-year old female who smoked two packs of cigarettes a day and was in "no acute distress." (Tr. 174.) The plaintiff's motor exam was normal and straight leg raising and hip provocative maneuvers came back negative. *Id.* Dr. Jestus ordered a lumbar myelogram, which confirmed a left sided L5/S1 disc herniation. (Tr. 173-74.) Dr. Jestus recommended surgery. *Id.* On March 13, 2000, Dr. Jestus performed a left L4-5 hemilaminectomy, partial medial facetectomy, and discectomy. (Tr. 172.) The plaintiff returned on March 28, 2000, and reported that her left leg pain was much improved after surgery; however, she still had occasional throbbing, but it was gradually improving and "much more tolerable than before." (Tr. 171.) The plaintiff returned to Dr. Jestus on April 28, 2000, stating that she was doing well, and her pain was better but not totally gone. (Tr. 170.) Dr. Jestus reported that "she has some pain when she bends forward and tries to lift things or is involved in a lot of strenuous activity which is reasonable." *Id.* The plaintiff was told to come back on an as-needed basis. *Id.*

In April 2000, the plaintiff was treated by Dr. Jain for asthma. (Tr. 187.) On June 3, 2000, plaintiff returned to Dr. Jain for a refill on her asthma and hypertension medication, and she complained of muscle spasm in her back and a severe headache. (Tr. 182.) On June 9, 2000, the plaintiff stated she "[felt] better" but was treated for degenerative disc disease, hypertension, and

4

asthma. (Tr. 180-81.) Dr. Jain prescribed Voltaren for her degenerative disc disease, a medication used to treat pain and inflammation caused by arthritis, as well as Lotensin for hypertension, and Combivent for asthma. *Id.* In a letter dated June 9, 2000, Dr. Jain opined that the plaintiff "should not lift over 3 pounds, should avoid prolonged stationary position, [and] should be permitted to move about periodically to maintain spiral flexion by stretching." (Tr. 179.) Dr. Jain also noted that the plaintiff was being treated for lumbago, or lower back pain, secondary to spinal degeneration, hypertension, and asthma. *Id.*

In June 2000, the plaintiff was evaluated and treated twice in the urgent care unit at the Cookeville Medical Center for headache, hypertension, and back pain, as well as difficulty with asthma following mowing her lawn. (Tr. 478-80.) She was prescribed medication for these symptoms. *Id.* The plaintiff continued to seek treatment at this facility over the next two years, primarily for her headaches, asthma/shortness of breath and hypertension, as well as for other routine care. (Tr. 414-522.)

On June 29, 2000, the plaintiff filed a "Disability Report - Adult," and on October 19, 2000, a "Disability Report - Field Office" was filed with the Social Security Administration ("SSA"). (Tr. 116-29.) On October 19, 2000, the plaintiff filled out an application for SSI. (Tr. 105-07.)

The plaintiff completed a pain questionnaire on November 8, 2000, and indicated that her pain began in 1987, increased around 1990, and became "occ[asionally] and temporarily intolerable" around 1993, with the first real sign of "unbearable" pain appearing in April 1995, which was so severe that she could not move. (Tr. 138-41.) The plaintiff stated that she was never free of pain. *Id.* The plaintiff indicated that she had been taking Voltaren and Flexeril daily for five months, and that the drugs did not relieve the pain but that they made it easier to tolerate. *Id.* The plaintiff also

5

noted that she had to slow down her household activities, that she stopped doing yard work, that she had to have someone start her mower when she mowed, and that she also had difficulty making the bed, doing laundry, and shopping. *Id.*

On December 6, 2000, Dr. Keown performed a consultative examination of the plaintiff at the request of the Tennessee Disability Determination Services ("DDS"). (Tr. 214.) Dr. Keown noted that the plaintiff complained that her back still hurt as it did prior to surgery, and that she was experiencing shortness of breath and was fatigued all the time, even with simple walking.[5] *Id.* Dr. Keown's assessment was that the plaintiff:

> gave poor effort to the range of motion exam of the lumbar spine however, she had negative straight leg raises on the left and right. Normal reflexia and intact motor strength. . . . [s]he sat on the examination table with both legs fully extended in front of her indicating that she ha[d] at least 80 to 90 degrees of anterior flexion in the lumbar spine. With regard to the history of asthma breath sounds [were] clear. . .

(Tr. 216.) Dr. Keown opined that the plaintiff could "sit, stand, or walk at least 6 hours in an 8 hour day during which she could routinely lift 10 pounds, episodically lift 20 pounds." *Id.* Dr. Keown ordered a pulmonary function test which showed chest restrictions. (Tr. 218-22.)

On December 20, 2000, a physical residual functional capacity ("RFC") assessment was administered on the plaintiff by a DDS physician.[6] (Tr. 223-30.) The examination indicated that the plaintiff could sit, stand, or walk 6 hours in an 8 hour workday, during which she could frequently lift 10 pounds and occasionally lift 20 pounds with no push/pull limitations (other than shown for lifting), and no manipulative, visual, or communicative limitations. (Tr. 216-17.) The examination

_____

[5] Dr. Keown also noted that despite the plaintiff's medical problems she still continued to smoke two packs of cigarettes a day and occasionally used alcohol. (Tr. 214-15.)

[6] The DDS physician's name is illegible. (Tr. 230.)

also revealed postural limitations, ranking the plaintiff's ability to perform all of the activities (*i.e.* balancing and kneeling) at "occasionally." (Tr. 225.) The assessment provided that she avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to the plaintiff's history of asthma. (Tr. 227.)

The agency issued an initial disability determination on January 1, 2001. (Tr. 72.) The agency determined that the plaintiff's condition "[was] not severe enough to keep [her] from working." *Id.* On January 4, 2001, the SSA issued a notice of disapproved claim for supplemental security income. (Tr. 75-78.)

On February 9, 2001, the plaintiff was referred by Upper Cumberland Career Center to Dr. Stephen Moore, D.O., a psychiatrist, with her chief complaint being depression. (Tr. 284.) Dr. Moore performed a psychiatric evaluation, during which the plaintiff indicated that her daughter was involved in an automobile accident in June 2000,[7] causing the plaintiff to experience new psychological stressors that contributed to her depressive state. *Id*. The plaintiff stated that she was not sure about her family psychiatric history,[8] but revealed that she was currently divorced, had been married three times, and currently lived with both of her children.[9] *Id.* The plaintiff noted symptoms of dysphoria, crying spells, thoughts of hopelessness and helplessness, difficulty sleeping, and problems with concentration. *Id.* As far as entering the workforce, the plaintiff indicated that she

_____

[7] The plaintiff stated that her daughter had a cervical neck fracture due to the accident.

[8] In another portion of the record, the plaintiff characterized her family's psychiatric background as "dysfunctional." (Tr. 233.) She stated that her mother was "physically abusive as well as un-nurturing." *Id.*

[9] The plaintiff indicated that she lived with her children because she was unemployed and had no income other than her daughter's disability check. (Tr. 284.)

7

was "ready for a new career" but she believed that "any job that she starts with will have to take into account her physical limitations caused by her lower back injury, and her current difficulties with attention and concentration." *Id.* In Dr. Moore's mental status evaluation of the plaintiff, he stated:

> [The plaintiff] was alerted and oriented to name place, and time. She had good eye contact and appropriate personal hygiene. Speech was fluent and goal directed, with a normal rate and rhythm. Her mood was depressed, but her affect was within normal limits. She denied any current suicidal or homicidal ideation.[10] Her insight and judgment were intact. No problems with short-term or long-term memory. Intelligence was estimated as average. No evidence of any overt psychotic process such as hallucinations or delusions.

(Tr. 285.) Dr. Moore stated that he believed the plaintiff's prognosis was good with appropriate psychiatric treatment. *Id.* However, he also noted that he was worried about her current vulnerability to stress. *Id.* Dr. Moore took progress notes regarding the plaintiff's mental condition from April 24, 2001, until October 3, 2001. (Tr. 280-83.)

On March 26, 2001, the plaintiff filed a request for reconsideration with the SSA. (Tr. 79-87.) The plaintiff specifically stated that she could not work due to her alleged disability. *Id.*

The plaintiff saw Donald W. Tansil, M.D., a doctor at the Putnam County Health Department with a speciality in public health and preventive medicine, from March 8, 2001, until April 4, 2001. (Tr. 231-32.) She reported to Dr. Tansil that after her back surgery, her pain initially got better, but had since worsened. *Id.* Dr. Tansil noted that the plaintiff was having difficulty sleeping at night, was depressed, and had asthma, back, and abdominal pain. *Id.* He prescribed medication that included Azmacort and Albuterol to treat her asthma, Nalfon for pain and inflammation, and

---

[10] Dr. Moore stated in this mental evaluation that the plaintiff denied current suicidal ideation; however, he noted in his recommendation that the plaintiff had "thought of suicide." (Tr. 285.)

Remeron, an anti-depressant. *Id.*  Dr. Tansil noted that x-rays taken on March 22, 2001, illustrated degenerative disc disease. *Id.* He recommended that the plaintiff take Tylenol with Flexeril, a medication used to treat muscle spasms, and he referred her back to Dr. Jestus for a second neurosurgery evaluation. *Id.*

On April 6, 2001, the plaintiff completed a daily activities questionnaire. (Tr. 155-62.)  The plaintiff indicated that her depression was a byproduct of her constant back pain and limited function, that she had been receiving mental health treatment, that she was taking medications for her depression and anxiety, that she had muscle spasms and limited strength, and that on some days she had difficulty getting out of bed. *Id.*  She stated that her current weight was about 198 pounds, that her condition affected her ability to think and concentrate, and that she had thought of ending her life many times. *Id.*  The plaintiff reported that when she left her home, she sometimes drove her daughter's car; however, sometimes she did not have access to this car and could not always walk where she needed to go. *Id.*  The plaintiff noted that she only ate once a day, she did the dishes and laundry, she got on her knees to make the bed because she could not stand due to back pain, and she also went grocery shopping because there was no one else to do it.[11] *Id.*

The plaintiff returned to Dr. Jestus on April 20, 2001. (Tr. 267.)  The plaintiff indicated that she was doing well until about five months prior when she complained that her "back pain had suddenly gotten worse." *Id.*  She likewise indicated that she had pain radiating into her bilateral hip region and some paresthesias down into her left leg. *Id.*  Dr. Jestus noted that the etiology of this

_____

[11] The plaintiff indicated that while she indeed went shopping for groceries, she could not carry them from her car into her house.  She stated that she had to make several trips back and forth in order to get the groceries inside, and afterwards she could barely walk due to pain. (Tr. 159.)

pain was indeterminate, and he recommended an MRI scan and blood work to make sure there was no infection or disc recurrence or instability. *Id.*

Before returning to Dr. Jestus in order to obtain the results of her MRI, the plaintiff was referred by the disability examiner to undergo a psychological evaluation on April 30, 2001, conducted by Jerell F. Killian, MS, a psychological examiner, and William R. Sewell, Ph.D, a psychologist. (Tr. 235.) During this evaluation, the plaintiff revealed that she experienced a nervous breakdown at the age of 14. *Id.* However, she stated that she had done reasonably well until recently when she began experiencing "multiple sources of stress," including loss of two jobs due to back problems, difficulties involving her children, having to give up her home and move into public housing, and her "reduced ability to support herself and control her life in general."[12] (Tr. 234.)

The April 30, 2001, psychological evaluation noted that the plaintiff stated that she still felt hopeless and helpless despite being on an antidepressant. The plaintiff lived by herself and managed most of the homemaking activities.[13] She noted that she had a valid driver's license but did not drive often due to her back pain. The plaintiff stated that she did not get out much, as compared to "the way she was prior to the onset of the back problems." Id. The psychological examiners noted that the plaintiff was "able to take care of most of her self-care," and that she at times had difficulty concentrating, but generally was able to maintain routine activities. The plaintiff's evaluation revealed that her mental status was adequately oriented, and her speech was coherent and relevant

---

[12] The plaintiff also revealed during this evaluation that she had a period of seizures during her childhood, but she "outgrew" them, and that she had enjoyed fairly good health as an adult until recent problems with high blood pressure, asthma, and back problems. (Tr. 233.)

[13] Dr. Moore noted in February 2001 that the plaintiff was living with both of her children and surviving on the sole income of her eighteen-year-old daughter's disability check. (Tr. 284.)

10

as she participated normally in casual conversation. While there were no blocked thoughts or psychomotor abnormalities, the examiners stated that the plaintiff appeared dysthymic, or mildly depressed. (Tr. 234-35.)  The examiners noted that the plaintiff exhibited no hints of aberrant thinking, and she related in a friendly, polite, and cooperative manner. (Tr. 235.)  The plaintiff's diagnostic impression was "Major Depressive Disorder Recurrent, Mild." *Id.*

On May 2, 2001, the plaintiff returned to Dr. Jestus' office in order to receive results from her MRI scan. (Tr. 266.)  The MRI revealed disc degeneration at L4/5, the same location as her previous surgery. *Id.*  Dr. Jestus noted that the plaintiff continued to have back pain that "sound[ed] discogenic in nature." *Id.*  Dr. Jestus offered another surgery, specifically a discography at L3, L4, and L5 followed possibly by a posterior lumbar interbody fusion. *Id.*  However, the plaintiff stated that she did not want to have another surgery. *Id.*  Dr. Jestus told the plaintiff of other treatments, such as physical therapy and epidural steroids, but he warned that "the success rate isn't all that great with those." *Id.*  Dr. Jestus also indicated that if such non-operative treatments failed, the plaintiff would either have to live with the pain or seek surgery.  However, he noted that he would not want to do a fusion on her until she quit smoking. *Id.*

Also on May, 2, 2001, the plaintiff underwent another RFC physical assessment completed by a DDS physician.[14] (Tr. 236-43.)  This RFC assessment was strikingly similar to the previous one conducted on December 20, 2000, and discussed above.[15]  This assessment indicated that plaintiff could sit, stand, or walk for 6 hours in an 8 hour workday, during which she could frequently lift 10 pounds and occasionally lift 20 pounds. *Id.*  The doctor further determined that plaintiff had no

[14] The DDS physician's name is illegible. (Tr. 243.)

[15] While the DDS physicians' names are illegible, the signatures are different.

11

push/pull limitations (other than as described for lifting) and had no manipulative, visual, or communicative limitations. *Id*. The doctor recommended avoidance of concentrated exposure to fumes, odors, dusts, gases, and poor ventilation as well as vibration. *Id*. Like the previous assessment, this assessment indicated postural limitations, rating the plaintiff's ability to perform maneuvers such as balancing and kneeling as only "occasionally." *Id.*

The plaintiff attended physical therapy as recommended by Dr. Jestus between May 8, 2001, until June 6, 2001, at Outpatient Physical Therapy Center. (Tr. 271.) Before starting physical therapy, the plaintiff was unable to lie flat on her stomach. *Id.* However, her physical therapist, in a letter to Dr. Jestus dated June 6, 2001, stated that the plaintiff was able to "perform prone lying" and "prone push-ups." *Id.* The physical therapist also noted that pain was not in the plaintiff's legs but was intermittently in her back. *Id.* The plaintiff's therapy included walking on the treadmill. *Id.* The physical therapist recommended a home exercise program and that the plaintiff return to Dr. Jestus if her pain significantly returned. *Id.*

On May 17, 2001, DDS physician George W. Livingston, Ph.D., completed a mental RFC assessment for the plaintiff as well as a Psychiatric Review Technique Form. (Tr. 244-60.) Dr. Livingston found the plaintiff to be "moderately limited" in regard to the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to respond appropriately to changes in the work setting; the ability to understand, remember, and carry out detailed instructions; and the ability to maintain attention and concentration for extended periods. *Id.* Dr. Livingston opined that

the plaintiff could do simple detailed tasks with normal supervision, that the plaintiff's interaction with others should be adequate for most work settings, and that the plaintiff could adapt. (Tr. 246.)

On May 30, 2001, the SSA denied the plaintiff's request for reconsideration. (Tr. 88-89.) The plaintiff then filed a request for a hearing before an ALJ on June 29, 2001. (Tr. 90-91.)

The plaintiff continued to see Dr. Moore for counseling sessions during June and July of 2001, but missed two appointments. (Tr. 281-82.) On July 11, 2001, the plaintiff was treated in the emergency department at Cookeville Regional Medical Center for acute sinusitis with various medications. (Tr. 400.) The plaintiff resumed seeing Dr. Moore for counseling sessions on August 17, 2001, reporting that she would restart taking her medication, Remeron, since she had been off of it for about four weeks, and her mood had worsened. (Tr. 281.) Dr. Moore noted the plaintiff was experiencing a worse mood, insomnia, and a decreased appetite. *Id.* The plaintiff returned to Dr. Moore on September 12, 2001, and Dr. Moore noted that the plaintiff's mood was "stable" and more "focused," but noted that the plaintiff felt as if she had "some kind of block" and could "not comprehend things." *Id.* The plaintiff stated that she was looking for work and wished to get a four year degree. *Id.* The plaintiff missed her two appointments in October 2001. (Tr. 280.)

On October 11, 2001, the plaintiff was treated for obstructive chronic bronchitis with acute exacerbation and for hyperventilation syndrome in the emergency department at Cookeville Regional Medical Center. (Tr. 387-96.) During this visit, the treating physician administered a chest x-ray, the results of which were normal. (Tr. 395.) On October 16, 2001, Dr. Jain administered a pulmonary function test on the plaintiff, which revealed moderate obstructive pulmonary disease. (Tr. 466.) Also in October 2001, the plaintiff began utilizing oxygen at her home via the Buckeye Home Health Center due to her shortness of breath, asthma, and pulmonary disease. (Tr. 261-64.)

13

On December 28, 2001, the plaintiff returned to the Cookeville Regional Medical Center complaining of numbness in both extremities bilaterally, dyspnea, anxiety, palpitations, drowsiness, and weakness. (Tr. 375.) She was hospitalized and treated for the following: hypokalemia, a condition in which the concentration of potassium in the blood is low; hypercalcemia, an elevated amount of calcium in the blood; dehydration; polycythemia secondary to emphysema, a condition in which there is an increase in the production of erythropoietin in the body; panic disorder; hypertension; and chronic obstructive pulmonary disease with acute exacerbation. (Tr. 377.) The on-duty physician, Hosakote Nagaraj, M.D., put her on anti-hypertensive medications, recommended counseling for smoking cessation since her present level of polycythemia was consistent with emphysema and a smoking history, and told her to continue taking Wellbutrin for depression, and Accolate for asthma. *Id.* On December 29, 2001, after a day in the hospital, the plaintiff's vital signs were considered "stable." (Tr. 374.) The plaintiff's hypokalemia and hypercalcemia were reported as "resolving," her hydration was "improved," her polycythemia was "definitely better," and the plaintiff was discharged from the hospital. *Id.*

On January 17, 2002, the plaintiff presented to Dr. Jain complaining of blurred vision, headaches, leg cramps, and hives. (Tr. 453.) The plaintiff was prescribed Prednisone, a medication used to treat severe allergies, arthritis, and asthma; Lopressor to treat high blood pressure; and Potassium Chloride to treat low amounts of potassium blood levels. (Tr. 453-57.) The plaintiff returned to Dr. Jain on February 2, 2002, complaining of hypertension and dyspnea (shortness of breath), and she was prescribed Lopressor and Clonidine HCl for her high blood pressure. (Tr. 449.) On February 22, 2002, the plaintiff again returned to Dr. Jain complaining of hypertension. (Tr. 448.) The plaintiff's physical exam on this date was normal with the exception of a trace of edema.

14

*Id.*  On April 2, 2002, the plaintiff was seen at the Cookeville Medical Center complaining of dizziness, severe headache, and achy legs with numbness, and she was prescribed Vioxx and Ultram for inflammation and pain. (Tr. 446.)

On April 30, 2002, the plaintiff presented to the Cookeville Medical Center, stating that she had been in a car accident the night before.[16] (Tr. 442.)  The plaintiff complained of left shoulder, neck, and spinal pain. *Id.*  A physical exam was administered which revealed a decreased range of motion in all joints accompanied by pain. *Id.*  The plaintiff was told to go to the emergency room if she developed a headache that did not go away with usual remedies, in the event of injury from whiplash. *Id.*  She was prescribed Vioxx and Zanaflex for her myalgia (muscle pain) and myositis (inflammation of the muscles). *Id.*

On May 20, 2002, the plaintiff went to the Cookeville Regional Medical Center complaining of back pain. (Tr. 371.)  The plaintiff was treated for neck pain from the late effects of her motor vehicle accident, and her hypertension was noted. *Id.*  The plaintiff was discharged and noted to be in "stable" condition with a "moderate" amount of distress. (Tr. 370.)  On June 10, 2002, the plaintiff was seen at the Cookeville Medical Center with complaints of headache, back, shoulder, and neck pain stemming from her automobile accident in April 2002. (Tr. 440.)  The plaintiff was treated with additional pain medications and Wellbutrin for her anxiety. *Id.* The plaintiff subsequently visited Dr. Jain at the Cookeville Regional Medical Center on June 17, 2002, complaining again of neck pain. (Tr. 364.)  An MRI was administered, and the results indicated an "essentially normal examination." *Id.*  The plaintiff started physical therapy for her neck pain on July

---

[16] The plaintiff stated that she was struck from behind by another motor vehicle the night of April 29, 2002.  She stated that she did not go to the emergency room the night of the accident because she felt she would "be all right." (Tr. 442.)

2, 2002, at the Cookeville Regional Medical Center Outpatient Rehabilitation three times a week for three weeks. (Tr. 351-62.)

On July 30, 2002, the plaintiff was evaluated for chest pain in the emergency department at Cookeville Regional Medical Center. (Tr. 433-37; 341-50.) She reported pain for three days, shortness of breath, and pressure in her head and neck. *Id.* She experienced relief of the pain when given Nitroglycerin in the emergency department. *Id.* The plaintiff was noted to have shortness of breath, wheezing, essential hypertension, and chronic obstructive asthma with no acute exacerbation. *Id.* The ER records indicate that she had "no active disease." (Tr. 349.) On August, 15, 2002, the plaintiff returned to Cookeville Regional Medical Center where results of an MRI of her spine and an EKG were normal. However, she was diagnosed with asthma and her blood oxygen level was under 88, qualifying her "for oxygen." (Tr. 433.)

The plaintiff returned for eight more sessions of physical therapy for her neck and back pain in the outpatient department of the Cookeville Regional Medical Center in September and October 2002. (Tr. 324-40.) The plaintiff's physical therapy discharge summary indicated that her current pain was only a one out of ten (ten being the most painful). (Tr. 340.) This summary also indicated that the plaintiff's goals were met, and she was discharged due to completion of the program. *Id.*

The plaintiff saw Dr. Kane, a pulmonary specialist, on October 3, 2002, for an evaluation. (Tr. 302-03.) During her initial office consultation, the plaintiff stated that she was diagnosed with asthma at age 14, that she began smoking at age 15, and that she continues to smoke two packs a day. (Tr. 296-97.) She noted that her problems with shortness of breath, weakness, and dyspnea had worsened over the past three to four months. She stated that she coughed in the mornings, and had coughed up blood for the past two weeks. She was using multiple different types of bronchodilators

16

and did have some relief. She stated that she had a cardiac stress test which revealed no coronary artery disease. The plaintiff also indicated that she had oxygen at home but rarely ever used it. An exercise treadmill test, performed on August 30, 2002, had been indeterminate at moderate workload with the myocardial perfusion scan showing no signs of ischemia or infarction. Dr. Kane noted that her shortness of breath appeared to have an anxiety component. (Tr. 299.) The plaintiff stated that her medication included: oxygen (very rarely), Azmacort, Accolate, aspirin, Advair, Baclofen, Aldactone, Clonidine, Wellbutrin, Neurontin, Toprol-XL, and Combivent. Dr. Kane's physical examination was normal with the exception of an "inspiratory squeak" and a "wheeze on the right." Dr. Kane's impression was that the plaintiff had probable asthma with co-existing chronic obstructive pulmonary disease, hemoptysis, which is the coughing up of blood that is associated with pulmonary disease,[17] possible obstructive sleep apnea, anxiety, chronic back pain and cigarette smoking. (Tr. 297.) Testing revealed severe obstructive pulmonary disease and hyperinflation diffusion corrected to normal. (Tr. 302-03.)

On November 8, 2002, Dr. Moore conducted a mental assessment of the plaintiff's ability to do work related activities. (Tr. 277-79.) Dr. Moore concluded that the plaintiff had poor concentration and attention problems that were worsened by any type of social interaction, had "[p]oor executive planning due to chronic anxiety and depression," and that her "[p]oorly treated (non-responsive to medications and therapy) depression and anxiety interfere[d] with judgment and insight." (Tr. 277-78.) Dr. Moore indicated the plaintiff had "significant patterns of social inhibition, poor self-image and affective mood instability that [would] cause her considerable

---

[17] Dr. Kane noted that the plaintiff's hemoptysis was concerning in a smoker, particularly because of the plaintiff's "adventitious breath sounds." (Tr. 297.)

Case 2:04-cv-00092   Document 17   Filed 09/23/08   Page 17 of 45 PageID #: 22

problems when dealing with any type of stressful situation, particularly in any type of interpersonal, social situation." (Tr. 278-79.)  However, Dr. Moore did note that the plaintiff could manage benefits in her own best interests.  (Tr. 279.)

The plaintiff returned to see Dr. Kane on November 11, 2002. (Tr. 294.)  The plaintiff reported that she continued to feel worse. *Id.*  She stated that her cough continued but her hemoptysis had resolved, and she indicated that she continued to experience shortness of breath and also continued to smoke despite repeatedly being told to quit.[18] *Id.*  Dr. Kane noted that the plaintiff had chronic asthmatic bronchitis with recurrent exacerbation; he prescribed Tequin, an antibiotic, and Prednisone taper, and advised the plaintiff to continue her pulmonary medication. (Tr. 295.)

On November 21, 2002, the plaintiff went for an intake and psychiatric evaluation with Dr. Kathleen McCoy,[19] a psychiatrist at McCoy Behavioral Health. (Tr. 309.)  She indicated that she was having problems regarding anxiety, family/marriage issues, crying spells, feeling fearful, depressed and sad, physical problems, changes in her sleep pattern, irritability, inability to concentrate, and had experienced a change in her energy level. *Id.*  The plaintiff also related that she had smoked marijuana "for pain," still smoked a pack of cigarettes a day, and occasionally drank alcohol. (Tr. 311.)  Dr. McCoy noted that the plaintiff's appearance was "disheveled" and her speech was "intrusive," but that she was alert and awake with full orientation. (Tr. 313.)  Dr. McCoy also noted that the plaintiff's thought process was paranoid with a flight of ideas, that she was noisy, disruptive, agitated, and restless, that her memory, abstraction, judgment, and insight were all

_____

[18] Dr. Kane noted that he reviewed with the plaintiff, once again, how vital it was for her to quit smoking. (Tr. 295.)

[19] Although the plaintiff referred to her as "Ms. McCoy," *see* Docket Entry No. 12, at 12, it appears that she is a medical doctor, *see* Tr. 30, as the ALJ assumed.

18

impaired, but her fund of knowledge (awareness of current events, past history, and vocabulary) was intact. (Tr. 315.)  Dr. McCoy administered the Hamilton Rating Scale for Depression ("Ham-D"), and the plaintiff's total Ham-D score was 41, which Dr. McCoy described as "severe." (Tr. 317.)  Dr. McCoy reported that the plaintiff had "incapacitating" anxiety, "severe" depersonalization and derealization, had "delusions of reference or persecution," had frequent complaints and requests for help, and had "severe" obsessive/compulsive symptoms. *Id.*

The plaintiff returned to Dr. Kane for a follow up visit on December 12, 2002, in which he indicated "[m]any positive findings." (Tr. 293.)  He noted that he believed the plaintiff was making progress with her therapist and that she had no lower extremity neurological complaints.  The plaintiff, however, continued to complain of intermittent headaches, back pain, shoulder pain and numbness, as well as chronic cough, insomnia, and general lethargy.  During Dr. Kane's physical examination, he indicated that the plaintiff was alert, oriented, and in no acute distress, that her breath sounds were clear throughout, that she had a regular heart rate and rhythm, that she had no significant edema, and that she had no local neurological findings.  Dr. Kane's impression of the plaintiff was that she had severe chronic obstructive pulmonary disease with no acute bronchitis episode, resolved hemoptysis, chronic back pain, paresthesias and discomfort involving the left shoulder and arm, and anxiety/bipolar disorder/depression.  Dr. Kane also noted that the plaintiff continued to smoke cigarettes but was "doing much better with this." *Id.*

On December 16, 2002, Dr. McCoy completed a mental assessment of the plaintiff's ability to do work related activities.[20] (Tr. 305-07.)  Dr. McCoy indicated that the plaintiff ranked "poorly"

---

[20]It is not clear whether Dr. McCoy again examined or personally evaluated the plaintiff on the date she completed this medical assessment, or whether her assessment was based on her previous examination and testing performed on November 21, 2001.

19

in her capability to make adjustments in relating to co-workers, dealing with the public, using judgment, interacting with others, dealing with stress, maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. The plaintiff ranked "fair" in regard to her ability to follow work rules, maintain attention and concentration, and being able to understand and carry out complex job instructions. Dr. McCoy indicated that the plaintiff could easily function independently, could manage benefits in her own interests "until proven otherwise," and could understand and carry out simple and detailed (but not complex) job instructions. *Id.*

On December 16, 2002, Dr. Jain completed a physical medical source statement of the plaintiff's ability to do work-related activities and indicated that the plaintiff was limited to lifting and/or carrying less than 10 pounds occasionally and frequently, to standing and/or walking less than 2 hours in an 8 hour work day, and to sitting about 4 hours in an 8 hour work day. (Tr. 415-17.) Dr. Jain stated that the plaintiff was limited in pushing and/or pulling in the lower extremities to an unspecified degree and that she would be required to periodically alternate sitting and standing to relieve pain or discomfort. Dr. Jain reported that the plaintiff's pain was frequent enough to interfere with attention and concentration, that she was capable of low stress jobs that created minimal anxiety and required minimal physical exertion, that she would need to take unscheduled breaks at two hour intervals, and that she was likely to have good days and bad days, with absences numbering about 3 times a month. Dr. Jain assessed the plaintiff as being able to balance occasionally but never to climb, kneel, crouch, or crawl due to her unstable gait. Dr. Jain noted that plaintiff had limitations in reaching in all directions due to her limited range of motion in the upper extremities. Dr. Jain opined that the plaintiff should avoid concentrated exposure to extreme cold

and heat, dust and vibration, and perfumes and solvents/cleaners. Dr. Jain also opined that the plaintiff should avoid all exposure to extreme cold, humidity/wetness, hazards, fumes, odors, dusts, gases, soldering fluxes, cigarette smoke, and chemicals due to her chronic obstructive pulmonary disease which would be exacerbated by particulates. *Id.*

### B. January 10, 2003 Hearing Testimony: The Plaintiff and a Vocational Expert

On January 10, 2003, the plaintiff had a hearing before ALJ Peter C. Edison. (Tr. 44-70.) The plaintiff was present and represented by an attorney, and Rebecca Williams, a vocational expert ("VE"), was also present. *Id.*

In response to questions posed by the ALJ, the plaintiff testified that she was 42 years old at the time of the hearing, and that she had finished 13 years of school and a vocational course in electronic office technology. (Tr. 47.) The plaintiff's last full-time job was with Lojack in 1999, but she was only there for three weeks because her back "went out."(Tr. 47-49.) The plaintiff testified that she was an assembler and had to lift cardboard boxes that were not very heavy but required constant moving. (Tr. 49.) The plaintiff stated that her work as an assembler at Lojak was "what finally made [her] back like it was." *Id.* The plaintiff reported that she formerly worked as a case manager for the Department of Human Services. (Tr. 48.) The plaintiff was also a waitress for five years. (Tr. 49.)

The plaintiff testified that after she quit work in 1999, she tried vocational rehabilitation but was unsuccessful because of her back problems and an inability to sit still due to the pain. The plaintiff next went to technical school for electronic office technology and completed that course in April of 2002. (Tr. 50.) The plaintiff related that during this course she had vison and breathing

problems as well as problems with going up and down the stairs and having to sit for periods of time. (Tr. 51.) The plaintiff testified that she had asthma as well as chronic obstructive pulmonary disease, and that she still has breathing problems even when taking medication. (Tr. 52.)

The plaintiff reported that she previously only experienced shortness of breath when climbing, walking, exercising, or carrying something, but as of the date of the hearing, she could barely even walk around her apartment without trouble breathing and back pain. (Tr. 53-54.) The plaintiff also stated that she could no longer eat regularly because of her breathing difficulties. (Tr. 54.) The plaintiff testified that she was constantly tired, but she did not know if "it [was from] the breathing or the medications that [she] take[s]." (Tr. 57.)

The plaintiff testified that in March 2000, Dr. Jestus performed back surgery on her, and that she continued to have back pain after surgery "just as bad" as she did prior to her surgery. (Tr. 57.) The plaintiff reported that she had pain "most of the time" and on a scale of zero to ten, with zero being no pain and ten being unbearable pain, the plaintiff said her typical level of pain was "at least an eight," and that muscle relaxants did not help her pain. (Tr. 58.) She stated that sometimes she could not get out of bed in the mornings, that her legs were stiff, and that she felt "frozen" when she sat down. *Id.* The plaintiff testified that she could only sit for about ten minutes without pain or stiffness, and that she often had to lie down. (Tr. 59.) The plaintiff stated that she could do nothing to relieve the pain. *Id.* Only a heating pad occasionally alleviated her upper back pain. *Id.*

The plaintiff reported that she was currently seeing Dr. Moore and Dr. McCoy for her depression. The plaintiff indicated that she initially started seeing Dr. Moore to help her deal with her failure to recover from her physical injuries and deal with her daughter's motor vehicle accident. The plaintiff said she had been "terribly depressed" until recently. The plaintiff stated that she could

22

not handle any stress, she did not want to do anything, was miserable all the time, got nervous around other people, and had problems with memory and concentration. (Tr. 61.)

The plaintiff reported that she did her own grocery shopping, but that it took her about two hours to do what she used to do in 30 minutes, and when she finished she could barely walk. (Tr. 62.) The plaintiff indicated that while she did drive, it had become harder, and she did not drive far, only making short trips to the doctor or into town. The plaintiff also stated that she occasionally visited her friends about twice a week but could not stay long because she could not sit still due to pain. *Id.* The plaintiff reported that after vacuuming she had to use oxygen due to her asthma. (Tr. 63.) The plaintiff did her own laundry sometimes; however, she did not cook or do any yard work. She testified that she used to love doing yard work but gave it up in April 2001. *Id.* The plaintiff indicated that she had a great amount of trouble lifting things. (Tr. 64.) She stated that she could barely lift a gallon of milk because it hurt her back so badly. *Id.*

Upon questioning from the ALJ, the plaintiff admitted that she used to be a heavy smoker, but smoked less than she had in the past. However, she admitted that she continued to smoke when someone shared cigarettes with her. *Id.*

The VE testified that the work the plaintiff did as a case manager was classified as a case aide and it was semi-skilled and a light job from an exertional standpoint. The VE also described the plaintiff's work as a waitress and assembler as light and semi-skilled. The VE testified that if the ALJ found that the plaintiff retained the RFC to perform a full range of light work, she could do all of her past work. (Tr. 65.)

The VE also testified that if the ALJ found that the plaintiff retained the RFC to perform light work which afforded a sit/stand option, there were jobs that the plaintiff, taking into account her age,

23

education, and past work experience, could be expected to perform. The VE reported that, in the state economy, there were an estimated 4,000 machine jobs, 1,200 assembly jobs, and 700 inspecting jobs at the light level in the state economy. (Tr. 66.) According to the VE, at the sedentary level, there were an estimated 8,000 cashiering jobs, 1,000 information clerk jobs, 1,000 receptionist jobs, and 1,000 teaching aide jobs. *Id.* The VE also reported that in manufacturing at the sedentary level, there were 5,200 assemblers, 1,200 inspectors, and 1,600 general laborers. (Tr. 67.)

The VE testified that if the plaintiff could not perform jobs which provided significant exposure to dust, smoke, or fumes, some of the jobs at the sedentary level would have to be eliminated. The VE opined that all the jobs at the sedentary level were characterized as low stress; however, none of those jobs at the light level were considered low stress since they were fast-paced. *Id.*

However, the VE testified that if he assumed that the plaintiff were restricted to lifting and carrying less than ten pounds frequently or occasionally, standing less than two hours in an eight-hour workday, sitting less than about four hours in an eight-hour workday, limited in her lower extremities in pushing and pulling, required to alternately sit and stand, would probably miss work about three times a month because of "bad days," could never climb, kneel, crouch, or crawl, and had to avoid all exposure to extreme cold, humidity, wetness, hazards, fumes, odors, dust, and grass, there would be no work that the plaintiff could perform. (Tr. 68.)

The VE opined that if the plaintiff were as restricted as Dr. McCoy and Dr. Moore stated in their psychological evaluations, those limitations would eliminate any jobs. (Tr. 69.) The VE testified that a requirement that the plaintiff carry oxygen with her to perform her job would have an impact on her ability to perform manufacturing jobs and would impact the plaintiff's ability to

24

engage in contact with the general public, but probably would not impact the job as a teacher's aide, although it might cause some difficulty with a cashiering job. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on March 26, 2003. (Tr. 17-37.)  Based on the record, the ALJ made the following findings. (Tr. 36.)

1.  The claimant has not engaged in any substantial gainful activity since the alleged onset of disability.

2.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.  The claimant has the following residual functional capacity: light work, with sit/stand option, that is not highly stressful and that does not require complex task performance.

7.  The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

8.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).

9.  The claimant has "more than a high school education" (20 CFR § 416.964).

10. The claimant has no transferable skills from any past relevant work  (20 CFR § 416.968).

25

11.    The claimant has the residual functional capacity to perform a significant range of light work  (20 CFR § 416.967).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision  (20 CFR § 416.920(f))

The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review on August 5, 2004. (Tr. 6-8.)


## IV. DISCUSSION

### A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).  A

reviewing court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)).  The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).  First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. 20 C.F.R. § 416.920(a)(4)(I).

Second, the plaintiff must show that she suffers from a "severe impairment."  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with

27

changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least 12 months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least 12 months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a prima facie case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a prima facie

case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[21] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step inquiry, and ultimately concluded that the plaintiff was not under a disability as defined by the Act. (Tr. 36.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. At step two, the ALJ found that the plaintiff had severe impairments or

---

[21]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

a combination of impairments considered severe based on the requirements in 20 C.F.R. § 416.920(b).[22]  At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  At step four, the ALJ found that the plaintiff was unable to perform any of her past relevant work.  At step five, the ALJ concluded that although the plaintiff's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 201.21 as a framework for his decision-making, there were a significant number of jobs in the national economy that she could perform. *Id.*

### C.  Plaintiff's Assertions of Error

The plaintiff alleges that the ALJ erred in rejecting the opinions of two treating physicians, and that the ALJ failed to properly evaluate the plaintiff's physical and mental impairments. Docket Entry No. 12, at 9.

The plaintiff alleges that the ALJ erred in rejecting the opinions of Dr. Jain and Dr. Moore, two of the plaintiff's treating physicians. Although there are many standards to which the ALJ must adhere in assessing medical evidence supplied in support of a claim, generally speaking, greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians. *See e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  This is commonly called the treating physician rule. *Id*. (citing other authority).

---

[22] The ALJ listed asthmatic bronchitis, chronic back pain and anxiety/depression as severe impairments in the body of his decision (Tr. 27), but did not address these impairments in his findings at the end of the decision. (Tr. 36.)

30

The treating physician rule directs the Social Security Administration's analysis of a plaintiff's treating physician's opinion. If the opinion of a "treating source" is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it must receive "controlling weight." 20 C.F.R. §§ 404.1527(d)(2), *and see id.* at 416.927(d)(2).[23] If a treating source's opinion is not given "controlling weight," specific factors must be used to determine what weight such an opinion will receive, and "good reasons" must be given in the decision to explain the resulting weight given to the treating source. *Id.* In giving "good reasons" for not according controlling weight to the treating source, the ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *2 (SSA July 2, 1996). The "specific reasons" must be so specific as "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* The ALJ is to consider the following factors in deciding what weight to give medical opinions: (1) the examining relationship, (2) the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors which tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(d)(1)-(6), *and see id.* at § 416.927(d)(1)-(6).

The Sixth Circuit has explained that the requirement that the ALJ provide an explanation for his decision has a two-fold purpose. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his [or her] physician has

---

[23]Section 404 of the C.F.R. outlines the procedures and regulations applicable to a claim for Disability Insurance Benefits, or DIB. Section 416 contains many identical provisions that apply in the context of claims for Social Security Income, or SSI. The "treating source rule" provisions are identical in both sections of the C.F.R. as cited.

deemed him [or her] disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that [he or] she is not, unless some reason for the agency's decision is supplied.'" *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* Because of the significance of the notice requirement in ensuring that each denied plaintiff receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and of explaining precisely how those reasons affected the weight accorded the opinions may constitute grounds for remand, even when the ALJ's conclusion may be justified based upon the record. *Id.* A court cannot excuse the denial of mandatory procedural protection simply because there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.[24] *Id.* at 546.

However, failure to give good reasons may not require reversal and remand when the violation of the relevant section of the C.F.R. amounts to a *de minimis* violation. *Id.* at 547. A *de minimus* violation does not occur when the claimant "'appears to have had little chance of success on the merits anyway.'" *Id.* at 546 (quoting *Mazaleski v. Treusdell,* 562 F.2d 701, 719 n. 41 (D.C.Cir.1977)). Instead, in *Wilson,* the Court identified the following examples of circumstances that "may not warrant reversal": (1) "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has

_____

[24] The ALJ need not engage in the same level and depth of analysis afforded to a treating source when the physician is found to be only an *examining* source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496 (6th Cir. 2006) (unreported).

met the goal of § 1527(d)(2) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation*." Id.* at 547. *See also Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 536 (6th Cir. 2001) (failure to address treating source's opinion harmless error when the ALJ adopted the treating source's recommendations). However, this Court has held that a "proper analysis of the factors listed in 20 C.F.R. § 416.927(d)(2)-(6) is not optional," and that "it is critical to provide 'good reasons' for the weight - or lack thereof - afforded. . . treating sources." *Birdwell v. Barnhart*, 2008 WL 2414828, at *13 (M.D.Tenn. Jun 12, 2008) (citing *Wilson*, 378 F.3d at 546) (Nixon, J.).

### 1. Dr. Jain

It is undisputed that Dr. Jain qualifies as a "treating source." *See* 20 C.F.R. § 404.1502 (defining "treating source"). Dr. Jain began treating the plaintiff on February 26, 1998. (Tr. 208.) Since that time and up until the time of her hearing, the plaintiff saw Dr. Jain over forty times. (Tr. 178-213, 414-522.) During these visits, the plaintiff consistently reported, *inter alia*, a history of high blood pressure, dizziness, chest pains, throbbing of the neck, shortness of breath, headaches, back pain, numbness in her legs, weakness, muscle spasms, blurred vision, chronic cough, and shoulder pain. *Id.* Dr. Jain administered numerous objective tests, he made diagnoses, he referred the plaintiff to specialists, and he authorized prescription medications. *Id.* Addressing the entirety of Dr. Jain's opinions, the ALJ said,

> The conclusions of the treating physician, based on his own examinations and treatment of the claimant, are afforded some but not substantial weight in this evaluation of ability to perform work-related functions, only insofar as it is consistent with his treatment and findings. The majority of his medical source limitations are not based on the objective evidence of the claimant's physical status but rather on her allegations and reporting.

33

(Tr. 31.)  Without further analysis of Dr. Jain's assessment, the ALJ gave substantial weight to the opinion of Dr. Keown, a consulting physician who performed only one examination of the plaintiff. The ALJ failed to elaborate or articulate what was lacking from Dr. Jain's objective evidence, and he failed to explain why Dr. Keown's assessment was given substantial weight.

Dr. Jain examined the plaintiff on a consistent and regular basis dating from 1998, allowing him to provide a detailed, longitudinal picture of the plaintiff's medical impairments that could not be obtained from objective medical findings alone or from reports of individual examinations.  As previously stated, if an ALJ chooses not to give a treating physician controlling weight, he must apply the remaining factors listed in 20 § C.F.R. 416.927 as well as give good reasons in his decision on the weight he gives the treating source.  First, the ALJ only vaguely stated that he afforded Dr. Jain's conclusions "some" weight. (Tr. 31.)   Then he failed to apply any factors or give good reasons for the weight he assigned to Dr. Jain's opinion.  The decision as a whole does not reveal what, if any, weight was actually given to some or all of the conclusions of this treating physician. The ALJ's brief statement does not satisfy the requirements or fulfill the purpose of the relevant statutes,  regulations, and controlling case law.

What little analysis the ALJ did provide is not supported by the record.  The ALJ stated that Dr. Jain's opinions were not based on objective evidence of the plaintiff's physical status.  However, as enumerated below, Dr. Jain performed several objective medical tests on the plaintiff over the course of his treating relationship.  Additionally, Dr. Jain referred the plaintiff to several specialists who also performed objective medical tests and concurred in Dr. Jain's diagnoses.

In early December 1999, a little under a month after the alleged onset of the plaintiff's disability, Dr. Jain ordered an MRI, which revealed disc extrusion. (Tr. 174.) The plaintiff was referred to Dr. Jestus, a neurosurgeon, and a lumbar myelogram confirmed a left sided L5/S1 disc herniation. (Tr. 173-74.) Dr. Jestus performed back surgery, specifically, a left L4-5 hemilaminectomy, partial medial facetectomy, and discectomy, on the plaintiff on March 13, 2000. (Tr. 172.) On June 9, 2000, Dr. Jain treated the plaintiff for degenerative disc disease, hypertension, and asthma. (Tr. 478.) Symptoms of degenerative disc disease include chronic low back pain radiating into the hips, pain in the buttocks or thighs while walking, sporadic tingling or weakness, and pain that may increase while sitting, bending, lifting, and twisting. (http://www.degenerativedisc.info/.) These are all symptoms that the plaintiff exhibited to Dr. Jain during routine physical exams throughout their treating relationship.

Dr. Jain's diagnosis of degenerative disc disease was also supported by Dr. Tansil, who specifically noted that x-rays taken on March 22, 2001, illustrated degenerative disc disease. (Tr. 231-32.) The same day, Dr. Tansil referred the plaintiff back to her neurosurgeon, Dr. Jestus. *Id.* After returning to Dr. Jestus, the plaintiff received MRI results on May 2, 2001, revealing disc degeneration at L4/5, for which Dr. Jestus recommended a second surgery.[25] (Tr. 266.) The plaintiff's disc degeneration was diagnosed, documented, and extensively treated by Dr. Jain and at least one other doctor, as well as a neurosurgeon. These objective findings and medical evidence support Dr. Jain's medical diagnoses and opinions regarding her conditions and limitations.

---

[25] On the same day that Dr. Jestus recommend surgery because the MRI results indicated disc degeneration, the plaintiff underwent her second RFC physical assessment. (Tr. 236-43.) That assessment provided the same functional capacity as that assigned by Dr. Keown, the physician to whom the ALJ afforded substantial weight.

Dr. Jain repeatedly documented his diagnoses of the plaintiff's asthma, hypertension, and chronic pulmonary disease. The plaintiff reported a history of hypertension to Dr. Jain during her first visit in 1998, and Dr. Jain treated the plaintiff with medication. (Tr. 208.) In April 2000, and twice in June 2000, the plaintiff was treated by Dr. Jain for asthma and hypertension. (Tr. 187, 182, 478-80.) On October 16, 2001, Dr. Jain administered a pulmonary function test on the plaintiff. (Tr. 466.) The test revealed moderate obstructive pulmonary disease. *Id.*

Other physicians also regularly noted the plaintiff's trouble with asthma, shortness of breath, hypertension, and chronic obstructive pulmonary disease. The plaintiff was hospitalized in the Cookeville Regional Medical Center on December 28, 2001, for treatment of hypokalemia, hypocalcemia, dehydration, polycythemia, panic disorder, hypertension, and chronic obstructive pulmonary disease with acute exacerbation, and she was found to be hypoxic with severe respiratory alkalosis on admission. (Tr. 377.) Dr. Kane, a pulmonary specialist, likewise supported Dr. Jain's conclusions. (Tr. 293.) On December 11, 2002, Dr. Kane reported that the plaintiff had severe chronic obstructive pulmonary disease. *Id.* Dr. Kane, on another visit, also stated that the plaintiff had chronic asthmatic bronchitis with recurrent exacerbation. (Tr. 294.) Dr. Jain's diagnosis of the plaintiff's asthma, hypertension, and chronic obstructive pulmonary disease was supported by every other treating doctor in the record, including a pulmonary specialist.

Dr. Jain completed a medical source statement of ability to do work-related activities on December 16, 2002, which the ALJ afforded only "some" weight because it was not "based on objective evidence."[26] (Tr. 31.) The ALJ rejected Dr. Jain's limitations, stating only that he

---

[26] The limitations contained in Dr. Jain's December 16, 2002, medical source statement are consistent with and actually less limiting than the limitations that Dr. Jain included in a letter on June 9, 2000, approximately three months after the plaintiff's back surgery. (Tr. 179.)

believed the limitations were not based on objective evidence, and he instead gave "substantial" weight to Dr. Keown, a consulting physician. (Tr. 31.)   However, the ALJ did not provide good reasons for rejecting Dr. Jain's December 16, 2002, assessment.

It is also significant that the plaintiff reported worsening back pain and complications subsequent to the RFC assessment credited by the ALJ.   Three months after Dr. Keown's assessment, Dr. Tansil referred the plaintiff to her neurosurgeon, Dr. Jestus, because an x-ray revealed degenerative disc disease on March 22, 2001. (Tr. 267.)   An MRI also revealed disc degeneration on May 2, 2001, five months after the assessment, and Dr. Jestus subsequently recommended surgery. *Id.*  Moreover, about a year and a half after the RFC assessment adopted by the ALJ, the plaintiff's back problems were exacerbated by a motor vehicle accident on April 29, 2002. (Tr. 442.).  After this accident, a physical exam revealed decreased range of motion in all joints accompanied by pain. *Id*.  The plaintiff also continued to be treated repeatedly for back pain.

The defendant asserts that the ALJ correctly determined the plaintiff's RFC based on substantial evidence in the record. Docket Entry No. 13.  However, such a conclusion amounts to post-hoc rationalization, and even if true, does not cure the ALJ's failure to provide sufficient reasons for not affording Dr. Jain's opinion controlling weight.  Meaningful review is impossible, given the ALJ's vague assertions that he "afforded some weight" and found objective evidence to be lacking.  Moreover, the ALJ failed to apply the factors listed in 20 C.F.R. § 404.1527(d)(2). Therefore, the ALJ's failure to give good reasons for the weight given to the medical opinions constitutes grounds to remand the Commissioner's decision.

The defendant makes several arguments to support the ALJ's decision to accord Dr. Jain's limitations only  "some" weight.  The defendant argues that, "aside from the recommendation in

Dr. Jain's medical source statement, the record does not contain evidence of any doctor (including Dr. Jain) recommending these limitations to the plaintiff." Docket Entry No. 13, at 9. In fact, the only other doctors who assigned less restrictive limitations were consulting physicians who each saw the plaintiff only once. The plaintiff, by her own admission, improved after her initial back surgery; however, her back problems and pain later worsened to the point that her neurosurgeon recommended a second surgery.

The defendant also argues that Dr. Jain based his findings on the plaintiff's allegations instead of objective evidence. Docket Entry No. 13, at 5. Although a plaintiff's statements alone are not enough to establish a disability, the current record contains numerous clinical visits, major back surgery, and numerous objective medical tests, such as lumbar MRIs, chest x-rays, pulmonary function tests, and blood oxygen laboratory test results, that all support the plaintiff's statements regarding her conditions and limitations. The plaintiff regularly saw Dr. Jain and other physicians, including a neurosurgeon and a pulmonary specialist, all of whom recorded the plaintiff's statements regarding her conditions and limitations and noted diagnoses, symptoms, and conditions tending to support and explain the plaintiff's assertions.[27] Therefore, it is not correct that the record as a whole contains *only* the plaintiff's complaints and statements of pain.

The defendant also argues that the plaintiff is prohibited from being found disabled because she was not always compliant with her treatment, and a failure to follow prescribed treatment without good reason will result in a finding of not disabled. Docket Entry No. 13, at 8. The defendant is referring to the plaintiff's inconsistency with her oxygen use and her failure to stop

---

[27] The plaintiff does not allege, and therefore the Court does not further address, the issue of whether the ALJ erred in evaluating the plaintiff's credibility and/or subjective complaints.

smoking as recommended by her doctor. The plaintiff admitted numerous times throughout the record that she continued to smoke and did not always use her oxygen regularly. However, during her hearing before the ALJ, the plaintiff testified that she was trying to quit smoking and was put on medication in the last year to help her quit. (Tr. 64-65.) The plaintiff also testified that she had to go off of some of her asthma medicine because it made her nervous, but she was using her oxygen more than she did in the past. (Tr. 52-53.) The plaintiff was otherwise compliant in seeking treatment and following her doctors' orders. She generally took her medication regularly and consistently sought and participated in treatment and therapy. In sum, the defendant's counter arguments fail to cure the ALJ's failure to give good reasons and provide meaningful analysis with respect to the opinions of the plaintiff's treating physician, Dr. Jain.

### 2. Dr. Moore and Dr. McCoy

The plaintiff also alleges that the ALJ erred in assessing the opinion of Dr. Moore, a treating psychiatrist.[28] In regard to the opinions of treating psychologists and/or psychiatrists, the Sixth Circuit has reasoned that:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine. . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric

---

[28] While the plaintiff did not expressly assert in the statement of errors that the ALJ erred by rejecting the assessment of Dr. McCoy, the plaintiff did assert this as an error in the section discussing Dr. Moore. Therefore, the Court will assume that the plaintiff is contending that the ALJ erred in rejecting Dr. McCoy's assessment as well.

methodology or in the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-84 (D.C. Cir. 1987), which quoted *Lebus v. Harris*, 526 F. Supp. 56, 60 (N.D. Cal. 1981)).

It is undisputed that Dr. Moore qualifies as a "treating source." Dr. Moore treated the plaintiff from February 9, 2001, until October 8, 2001, and gave a mental medical assessment of the plaintiff's ability to do work related activities on November 8, 2002. (Tr. 276-85.) Addressing the entirety of Dr. Moore's opinions, the ALJ found that:

> The conclusion of the treating psychiatrist, based on his own examination and treatment of the [plaintiff], is not afforded substantial weight in this evaluation of ability to meet the basic mental demands of work, since his assessment appears to be based more on [the plaintiff's] reported complaints and history than on actual findings.

(Tr. 31.) Dr. Moore saw the plaintiff on numerous visits, took treatment notes, prescribed medication, conducted a psychiatric evaluation and a mental status evaluation, and diagnosed the plaintiff with major depression, recurrent, mild. The ALJ rejected Dr. Moore's opinion because it was "based more on her reported complaints and history than on actual findings.." (Tr. 31.) This is not a sufficient reason to reject a psychiatric assessment since most mental impressions and diagnoses are based on such a reported history. The Court notes that Dr. Moore was the only psychiatrist who evaluated the plaintiff on a regular basis, and, in fact, he was the only psychiatrist who evaluated the plaintiff for longer than one month. As such, Dr. Moore's conclusions and opinions are inherently more valuable and reliable than other assessments by professionals with much more limited interactions with the plaintiff because of his unique understanding of the plaintiff's mental health history.

40

Dr. Moore diagnosed the plaintiff with "major depression, recurrent, mild" on February 9, 2001. (Tr. 285.) The defendant concedes that this diagnosis is supported by other medical consultants; however, the defendant argues that Dr. Moore limited the plaintiff's abilities more significantly than the other doctors. Docket Entry No. 13, at 12. As addressed above, Dr. Moore was the only psychiatrist who evaluated the plaintiff on a consistent basis, putting him in a better position to understand the severity of the plaintiff's condition and resulting limitations. Although the ALJ only briefly stated that Dr. Moore's opinion lacked documentation of actual findings, his explanation as to why Dr. Moore's assessment was not afforded substantial weight falls short of the requirement that he give "good reasons."

The ALJ also did not afford substantial weight to the opinion of Dr. McCoy, who saw the plaintiff on two occasions on November 21, 2002, and on December 16, 2002. [29] Addressing the entirety of Dr. McCoy's opinions, the ALJ said,

> The conclusions of this treating psychiatrist, based on her own examination and treatment of the [plaintiff], is not afforded substantial weight in this evaluation of ability to meet the basic mental demands of work, since the assessment does not correlate with the reported history and findings and is inconsistent with other medical source assessments.

(Tr. 31.)

As a threshold matter, although the ALJ apparently assumed so, it is not clear to this Court that Dr. McCoy qualifies as a treating source. Before determining whether the ALJ violated the treating source rule, a court must first classify that source as a treating source. *See, e.g., Smith v. Comm'r of Soc. Sec'y*, 482 F.3d 873, 876 (6th Cir. 2007). A physician qualifies as a treating source

---

[29] Dr. McCoy is the only psychiatrist, other than Dr. Moore, who evaluated the plaintiff on more than one occasion.

41

for purposes of the rule entitling his or her opinions to controlling weight if the plaintiff sees the doctor with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. *See* 20 CFR 404.1502, 404.1527(d)(2). *See also Cruse v. Comm'r of Soc. Sec'y*, 502 F.3d 532, 540 (6th Cir. 2007). Whether a physician qualifies as a treating source is a fact-specific inquiry and can amount to a close call. In *Cruse*, a psychiatrist who performed a new patient evaluation and saw the plaintiff twice more over a period of approximately seven months was deemed to be a treating physician for purposes of the treating source rule. *Id.* at 536, 540. *See also Smith*, 482 F.3d at 876 (finding that when one physician saw the plaintiff only once and wrote a single physical capacity evaluation and a second physician saw the plaintiff on multiple occasions but merely completed a medical report, prescribed and refilled medication and denied additional medication when the plaintiff returned seeking more, neither physician qualified as a treating source). Although Dr. McCoy did complete an "initial inquiry," including taking a personal history and completing a treatment plan, as well as administering a Ham-D rating for depression, it is not clear from the record in this case whether Dr. McCoy even saw the plaintiff on more than one occasion. *See supra* n. 20. However, the ALJ concluded without analysis that Dr. McCoy was a treating source. Although an opposite conclusion might have been reached, the Court cannot find that there is no substantial evidence in the record to support that conclusion. Therefore, the Court defers to – without necessarily endorsing – the ALJ's finding that Dr. McCoy was a treating source.

The ALJ's stated reasons for rejecting the opinion of Dr. McCoy are vague and devoid of meaningful analysis. Although it is unclear what "other medical assessments" the ALJ believed were inconsistent with Dr. McCoy's conclusions, the Court assumes that the ALJ was referring to

the opinions of agency consultants, because Dr. McCoy's evaluation is consistent with Dr. Moore's, the only other treating psychiatrist. Dr. McCoy found substantial mental limitations that parallel Dr. Moore's limitations. (Tr. 305-15.) Thus, the only two treating psychiatrists' opinions contained in the record were consistent with each other.

The ALJ did not afford substantial weight to either of the psychiatrists (Dr. Moore and Dr. McCoy) who evaluated the plaintiff on more than one occasion. Likewise, the ALJ never indicated what weight, if any, was given to the state agency medical consultants. The ALJ stated that he "consider[ed] these opinions," yet he never elaborated beyond that statement as to how those opinions affected his decision. (Tr. 32.) The ALJ also stated that "the state agency consultants did not have access to more recent medical evidence" nor did they "have the benefit of hearing the [plaintiff's] testimony." *Id.* While the ALJ did not mention whether or not these factors affected his conclusions, because the limitations in the May 17, 2001, assessment and the limitations and RFC that the ALJ assigned to the plaintiff were strikingly similar, the Court assumes that the ALJ adopted the limitations in Dr. Livingston's May 2001 assessment.

The ALJ found the plaintiff to be mildly to moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted, to complete a normal work week without interruption from psychologically based symptoms, to respond appropriately to changes in the work setting, to accept instruction and criticism from supervisors, and to interact appropriately with the general public. (Tr. 33.) The RFC mental assessment and psychiatric review technique form completed by Dr. Livingston echoes these same "moderately limited" results (Tr. 244-60), whereas Dr. Moore and Dr. McCoy's opinions

43

ranked the plaintiff to be "overall poor" or "fair" in most of the above categories. (Tr. 277-85; 304-17.) The ALJ is not free to disregard the opinions of the plaintiff's treating psychiatrists without engaging in the required analysis, and he is certainly not permitted to adopt the opinions of the consultative physicians and/or craft his own independent assessment of the plaintiff's mental RFC.

In sum, the ALJ failed to provide good reasons for rejecting the opinions of Drs. Jain, Moore, and McCoy, all treating sources. The ALJ was not free to accept the contrary opinion of Dr Keown, a DDS physician who examined the plaintiff only once, and to craft his own mental RFC based on the opinion of another DDS consultant, without providing good reasons. Therefore, this case should be remanded for reevaluation of the treating source opinions of Drs. Jain, Moore, and McCoy, either giving their opinions the controlling weight due to treating sources and evaluating an appropriate RFC, if any, in light of their opinions and all of the other medical evidence of record, or providing the requisite good reasons for not crediting these opinions in accordance with the relevant regulations and case law.

The plaintiff's remaining general assertion of error that the ALJ failed to properly evaluate the plaintiff's physical and mental limitations is not analyzed separately here in light of the Court's finding that the case should be remanded.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 11) be GRANTED to the extent that the case be REMANDED for consideration by the ALJ as set forth above.

44

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge